Argued and submitted January 17, reversed and remanded May 21, 1986

PARKER,
*Petitioner,*

*v.*

PUGET SOUND TRUCK LINES, INC. et al,
*Respondents.*

(85-AB-577; CA A35861)

719 P2d 70

David B. Hydes, John Day, argued the cause and filed the brief for petitioner.

Robert J. Lee, Portland, and Bullard, Korshoj, Smith & Jernstedt, P.C., filed the brief for respondent Puget Sound Truck Lines, Inc.

Michael D. Reynolds, Assistant Attorney General, Salem, waived appearance for respondent Employment Division.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

WARDEN, J.

.

## WARDEN, J.

Petitioner seeks review of an order of the Employment Appeals Board denying him unemployment compensation benefits. We reverse.

With one member dissenting, EAB affirmed the referee's decision, which was based on these findings:

"(1) Claimant worked as a truck driver on December 18 and 19, 1984, operating the employer's tractor towing a set of doubles from John Day, Oregon, via Pilot Rock and Pendleton, to Wallula Junction, six miles north of the Oregon border in Washington, then back to Pilot Rock. (2) Although claimant was to have returned to John Day, he quit the job when he returned as far as Pilot Rock (the employer has its major terminal for the area in Pilot Rock). (3) Claimant had been given a test run by the employer on December 16, 1984. (4) Claimant has had seven years of experience driving various types of motor vehicles and had been referred to the job by the local John Day employment office of the Employment Division. (5) When claimant began work on December 18, he started at 7:00 a.m. (6) He drove to Mt. Vernon, where the trailers were loaded with barkdust, leaving there at 11:30 a.m. (7) The weather was snowy and cold and claimant was stuck three times at the loading site with the vehicle. (8) There was snow on the highway, and claimant had to chain up the vehicle and drove in snow for some distance through the mountains. (9) Claimant got to Pilot Rock at 4:00 p.m., where he followed a lead truck to show him the way to the unloading site. (10) Somewhere in the vicinity of Pendleton, claimant's vehicle spun out, and it was some time before it was back on the highway again. (11) While this was taking place, a wheel drum on the lead vehicle froze up (while it was standing) and it took until 9:00 p.m. before the employer's mechanic arrived to fix it. (12) The two vehicles got to Wallula Junction at approximately 11:30 p.m., where they had to wait until 5:30 the next morning to be unloaded. (13) When claimant and the lead vehicle got to the unloading site at Boise Cascade's mill, there was one other truck to be unloaded ahead of them, and the pit in which the barkdust was to be dumped was full of frozen rock (a load of barkdust which had rock mixed in with it had been previously dumped into the pit). (14) After claimant's vehicle was unloaded, he drove back to the Oregon border, pulled off to the side of the road, and slept for one and a half hours in the cab of the vehicle. (15) When claimant returned to Pilot Rock at 9:00 a.m., he informed the employes

at the dispatcher's office that he did not have to work those kind of hours, and quit the job by turning in the keys to the truck. (16) Although claimant had intended to talk with the terminal manager about it before quitting, the manager was not there at the time. (17) When claimant turned in the keys, he was supposed to have returned the truck to the John Day area and had it loaded with barkdust for another trip. (18) Claimant spent a total of ten and a half hours loading and/or unloading, or waiting for such. (19) He had a total of 14 hours driving time and one and a half hours sleeping, for a total on the trip of 26 hours. (20) The round trip mileage distance between John Day and Wallula Junction is 392 miles, of which claimant drove 360 miles. (21) Had claimant completed the trip, he would have put in another three hours in returning from Pilot Rock to John Day. (22) Although the weather was severe, and driving conditions hazardous, the average time per driver for the trip at that time was 12 and one-half hours. (23) The employer has 16 sets of doubles operating between John Day and Wallula Junction on the Boise Cascade haul. (24) Claimant was paid $6.40 an hour, plus 15 cents a miles for his services. (25) At the time of his quitting the job, claimant had no other employment elsewhere."

The referee concluded that claimant did not have good cause to leave employment:

"Claimant voluntarily left work without good cause under ORS 657.176.

"OAR 471-30-038(4) states that 'good cause' for voluntarily leaving work is '[S]uch that a reasonable and prudent person of normal sensitivity, exercising ordinary common sense, would leave work. The reason must be of such gravity that the individual has no reasonable alternative but to leave work.'

"It is understandable that claimant, who has had considerable experience as a truck driver, would become more than disenchanted with the trip that he had experienced between John Day and Wallula Junction. Both the weather and road conditions were against him, and in spite of his chaining up the vehicle twice, he still slid off the road on the one occasion. Even the lead truck broke down while waiting on claimant's vehicle to be put back on the highway. Then, when claimant finally got to the unloading site, everything was frozen up and he had to wait an unusual amount of time. None of these conditions were [sic] attributable to the employer, and they did not render the job itself unsuitable. Those individuals who have to make their livelihood from operating vehicles over the

highways have to accept the conditions as they are from day to day. It is axiomatic that some days will be bad, such as claimant experienced on his only trip for the employer, but that other days will be good. Obviously, winter driving conditions would be altogether different than during the middle of the summertime."

The findings do not support the conclusion that petitioner left work without good cause. No one disputes that petitioner was working in severe winter conditions. However, that the employer was not responsible for the weather does not explain why petitioner's refusal to work continuously for over 24 hours in such conditions does not constitute good cause. There is no finding that there was any alternative available to petitioner other than to continue the trip. If other alternatives were available and reasonable, EAB must say so. *Bremer v. Employment Division,* 47 Or App 1131, 1137, 615 P2d 1170 (1980).

EAB also must explain why a reasonable and prudent person would not leave work when continuing the trip would have been in violation of the law. By OAR 860-65-010(d), the Public Utility Commissioner adopted the federal regulations for on-duty time between December 16 and April 30. 49 CFR § 395.3(a) reads in part:

"[N]o motor carrier shall permit or require any driver used by it to drive nor shall any such driver drive:

"* * * * *

"(2)   For any period after having been on duty 15 hours following 8 consecutive hours off duty."

Reversed and remanded for reconsideration.